65 Cal.Rptr.3d 393 (2007)
154 Cal.App.4th 1090
CONSERVATORSHIP OF the Person of JOHN L.
San Diego Health & Human Services Agency, Petitioner and Respondent,
v.
John L., Objector and Appellant.
No. D048654.
Court of Appeal of California, Fourth District, Division One.
August 31, 2007.
*395 Linda M. Fabian, under appointment by the Court of Appeal, San Diego, for Objector and Appellant.
John J. Sansone, County Counsel, and Leonard W. Pollard II, Deputy County Counsel, for Petitioner and Respondent.
*394 O'ROURKE, Acting P.J.
John L.[1] appeals from a judgment establishing a conservatorship for him under the Lanterman-Petris-Short Act (LPS Act, Welf. & Inst.Code, § 5000 et seq.). The trial court entered judgment after excusing John from appearing at the conservatorship establishment hearing (Welf. & Inst.Code, § 5350) on his appointed counsel's assertion that John did not contest *396 the conservatorship and did not wish to be present. On appeal, John contends the judgment establishing a conservatorship was reversible error because the trial court (1) improperly proceeded with his LPS hearing in his absence without satisfying conditions excusing his mandatory presence under Probate Code section 1825, and (2) did not conduct on-record voir dire required by Probate Code section 1828. He further contends the conservatorship judgment violated his state and federal constitutional due process rights because the court did riot comply with the aforementioned statutory safeguards intended to minimize the risk of error, and consequently it did not have evidence from which it could reasonably determine he knowingly and intelligently waived his rights. While we agree that a proposed conservatee has both a statutory and procedural due process right to be present at his LPS conservatorship establishment hearing, we hold that appointed counsel may communicate a proposed conservatee's waiver of his or her right, and an effective waiver will be inferred by virtue of counsel's authority to act on his or her client's behalf with the client's consent. Because counsel's representation in this case was sufficient to establish that John had waived his right to be present, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND
In March 2006, the public conservator filed an ex parte petition for the appointment of a temporary conservator and conservator for John based on allegations that he was gravely disabled as a result of a mental disorder or chronic alcoholism. Appended to the petition was a social worker's sworn declaration requesting waiver of the notice requirement on grounds there was insufficient time to conduct a conservatorship investigation and serve notice based on John's manic and disorganized condition, inability to care for himself, and refusal to take medication or accept treatment voluntarily. In a declaration filed in lieu of a conservatorship investigation report, John's treating physician, Christopher Gorman, M.D., averred he had diagnosed John with "Bipolar Disorder, manic c psychotic features." Dr. Gorman stated John was unable to provide for his needs for food, clothing and shelter based on the fact he took food from other patient trays, was evicted from his apartment, barricaded the door to his room requiring fire department intervention, often walked around with his shirt open, and had attempted to leave his room one night unclothed from the waist down. In a separate "Declaration and Notice to Patient of Intent to Recommend Conservatorship of the Person" provided to John, Dr. Gorman averred he had advised John of the fact and nature of the conservatorship petition, the possible orders that could result from a hearing on the petition, John's right to be present at the hearing, his right to hire an attorney of his choice or have one appointed for him, his right to a court or jury trial, and his right to confront and cross-examine witnesses and produce witnesses in opposition to the petition.[2] The court *397 granted the ex parte petition and appointed a temporary conservator.
Thereafter, on March 17, 2006, the public conservator filed a "Citation for Conservatorship and Conservatorship Investigation Report" (Investigation Report) that included recommendations that the public conservator be appointed as John's conservator and that the least restrictive placement be a locked treatment facility. The Investigation Report, notice of hearing for the LPS conservatorship and ex parte petition were served on John's appointed counsel, Lidia Garcia. In the Investigation Report, the county investigator summarized John's lengthy history of mental illness dating back to the early 1960's and noted he had previously been diagnosed with schizophrenia, but stated he was currently diagnosed as "Bipolar Manic with Psychosis." She reported John had numerous past involuntary hospitalizations with a long history of medication noncompliance, a significant history of violent and obstreperous behavior when hospitalized, and an "extremely turbulent" present course at Palomar Hospital.[3] The investigator stated she had met with John on March 3, 2006, at Palomar Hospital, where although he appeared sedated and exhibited delusions, he "made it clear that he did not want a Conservator and thought that he did not need any assistance." John was personally served with the citation for conservatorship and ex parte petition on March 20, 2006.
The hearing on John's petition took place on April 4, 2006, in John's absence. The matter consisted entirely of the following colloquy:
"[John's counsel]: Lidia Garcia on behalf of Mr. L[ ]. Your honor, I have visited with him at Telecare Choices. Recently he was here. He had requested a writ which he took off calendar. At any rate Mr. L[.] is doing much better. [¶] We discussed the conservatorship and on Friday then he wished to put it over until yesterday so that he could think about it. When we met he indicated that at this time he was not contesting the conservatorship. He did not want to be present in *398 court. So we would ask the court to excuse his presence.
"The Court: His presence is excused.
"[Mr. Pollard]: Leonard Pollard representing the Public Conservator, your honor. In each of these cases a petition has been filed requesting establishment of a conservatorship, along with a supporting medical report. The medical report recommends the rights and disabilities to be imposed upon the conservatee, the least restrictive level of placement, and the individual to be served as conservator. I would ask the court receive the reports into evidence and establish conservatorship as requested.
"[John's counsel]: No objection.
"The Court: Then in each case the report is received in evidence and the order will be in accordance with the recommendations therein." The minute order states counsel stipulated that the Investigation Report be admitted into evidence.
John appeals from the judgment.

DISCUSSION
John contends the court violated his statutory rights as well as his state and federal constitutional rights to due process by proceeding with his LPS hearing in his absence and accepting what amounted to a waiver of his trial rights without evidence that his waiver was knowingly and intelligently given. Specifically, John points to Probate Code section 1825's dictate that the proposed conservatee "shall be produced" at the LPS hearing, unless (among other exceptions) the "court investigator" reports to the court that the proposed conservatee is not willing to attend and does not contest the conservatorship or the proposed conservator. (Prob.Code., § 1825, subd. (a)(3).)[4] He argues the stated exception was not met because the investigator in his case specifically stated in her Investigation Report that John did not want a conservator. John maintains that, as a consequence, the petitioner did not prove he knowingly and intelligently waived his hearing rights; in particular, his counsel's unsworn statements at the hearing were not evidence and did not suffice to constitute a waiver of his right to be present.
In response, respondent San Diego Health and Human Services Agency (Agency) argues Probate Code section 1825's conditions were met through John's appointed legal counsel (Welf. & Inst. Code, § 5365), who communicated John's wishes to the court at the hearing. Noting the differences between Probate Code conservatorship investigations and LPS conservatorship investigations, Agency argues the role of a court investigator in LPS proceedings is in effect filled by a proposed conservatee's appointed counsel, who may advise the court as to whether the conservatee is willing to attend or does not contest the conservatorship. Agency maintains counsel is not prohibited from waiving the proposed conservatee's presence at the LPS hearing.

*399 I. Standard of Review

This court recently addressed the proper standard of review on a conservatee's claim of a procedural due process violation in Christopher A, supra, 139 Cal.App.4th 604, 43 Cal.Rptr.3d 427. Christopher A involved the trial court's adoption of a proposed judgment establishing a conservatorship and delineating placement, disabilities and conservator's powers without first consulting the conservatee and obtaining his on-the-record consent. (Id. at pp. 608-610, 43 Cal.Rptr.3d 427.) We stated, "Determining if the trial court adhered to a constitutional principle is solely a question of law. [Citation.] The issue of whether procedural due process requires court consultation with and consent of a conservatee on the record before imposing the placement, disabilities, and conservator powers included in a judgment approved by the conservatee's attorney (stipulated judgment) is a question of law. Therefore, we review this issue de novo." (Id. at pp. 609-610, 43 Cal.Rptr.3d 427.)
John's contentions here likewise raise issues of law, because the underlying facts are undisputed and the question of whether the trial court met the requirements relating to a proposed conservatee's presence at his or her LPS hearing requires the interpretation of provisions of the Probate Code and LPS Act and their application to those facts. "Issues of statutory construction as well as the application of that construction to a particular set of facts are questions of law." (Coburn v. Sievert (2005) 133 Cal.App.4th 1483, 1492, 35 Cal.Rptr.3d 596.) Whether procedural due process requires John's presence and on-record voir dire at his LPS hearing is also a question subject to our independent review. (Christopher A, supra, 139 Cal. App.4th at pp. 609-610, 43 Cal.Rptr.3d 427.)

II. The LPS Statutory Scheme Relating to Conservatorship Investigation

Our resolution of the questions presented on this appeal are assisted by an examination of provisions of the LPS Act relating to conservatorship investigation. Welfare and Institutions Code section 5350 provides that a "conservator of the person ... may be appointed for any person who is gravely disabled as a result of mental disorder or impairment by chronic alcoholism ...." and sets forth the procedure for the conservator's appointment. Under that section, "[t]he procedure for establishing, administering, and terminating a conservatorship under this chapter shall be the same as that provided in Division 4 (commencing with Section 1400) of the Probate Code, except as follows: [¶] ... [¶] ... (f) Conservatorship investigation shall be conducted pursuant to this part and shall not be subject to Section 1826 or Chapter 2 (commencing with Section 1850 [`Periodic Review of Conservatorship'] ) of ... the Probate Code." (Welf. & Inst.Code, § 5350.)[5] The LPS *400 Act defines "Conservatorship investigation" as "investigation by an agency appointed or designated by the governing body of cases in which conservatorship is recommended pursuant to Chapter 3 (commencing with [Welfare and Institutions Code s]ection 5350.)" (Welf. & Inst. Code, § 5008, subd. (g).)
In San Diego County, the public conservator is the designated person to conduct conservatorship investigations and establish LPS conservatorships under the LPS Act. (San Diego County Admin. Code, § 234; Welf. & Inst.Code, §§ 5351, 5355; see Kaplan v. Superior Court (1989) 216 Cal.App.3d 1354, 1357, 1360, 265 Cal.Rptr. 408; Conservatorship of Cabanne (1990) 223 Cal.App.3d 199, 202-203, 272 Cal.Rptr. 407.)
Under the LPS Act, "[w]hen the professional person in charge of an agency providing comprehensive evaluation or a facility providing intensive treatment" determines that a person in his or her care meets the requirements for conservatorship, "he [or she] may recommend to the officer providing conservatorship investigation of the county of residence of the person prior to his [or her] admission as a patient in such facility." (Welf. & Inst. Code, § 5352; Kaplan v. Superior Court, supra, 216 Cal.App.3d at p. 1357, 265 Cal. Rptr. 408.) "If the officer providing conservatorship investigation concurs with the recommendation, he shall petition the superior court in the county of residence of the patient to establish conservatorship." (Welf. & Inst.Code, § 5352.) Before the hearing on the petition, "[t]he officer providing conservatorship investigation shall investigate all available alternatives to conservatorship and shall recommend conservatorship to the court only if no suitable alternatives are available" (Welf. & Inst.Code, § 5354) and "prepare and present to the court a comprehensive report discussing available alternatives to conservatorship, and detailing pertinent information about the patient's background, including family, medical and psychological history, assets, etc. The report must state whether the investigator recommends a conservatorship, and, if not, describe the possible alternatives. The report must also suggest a suitable conservator, recommend what powers the conservator shall be granted or denied, and suggest an appropriate placement." (Kaplan v. Superior Court, at p. 1357, 265 Cal.Rptr. 408, citing Welf. & Inst.Code, §§ 5354, 5355[6] and 5356.)[7]

*401 III. Application of the Probate Code Section 1825(a)(3) Exception to a Proposed Conservatee's Mandatory Presence at the LPS Conservatorship Hearing

At issue is the following provision of Probate Code section 1825: "The proposed conservatee shall be produced at the hearing except ... [¶] ... [¶] ... [w]here the court investigator has reported to the court that the proposed conservatee has expressly communicated that the proposed conservatee (i) is not willing to attend the hearing, (ii) does not wish to contest the establishment of the conservatorship, and (in) does not object to the proposed conservator or prefer that another person act as conservator, and the court makes an order that the proposed conservatee need not attend the hearing." (Prob.Code, § 1825, subd. (a)(3), italics added.)
There is no dispute that Probate Code section 1825 applies to LPS proceedings (Welf. & Inst.Code, § 5350) and gives John a statutory right to be present at his hearing to establish an LPS conservatorship. Nor do the parties dispute that the Legislature has set out specific provisions for a waiver of that right in subdivision (a) of that section. The question is whether in this case, the conditions of that section were met when the trial court permitted John's appointed counsel, rather than the "court investigator" referenced in subdivision (a)(3) of that statute, to communicate John's waiver of his presence.
We begin by asking whether the Legislature intended to refer to the "officer providing conservatorship investigation" appointed by the County of San Diego when it used the term "court investigator" in Probate Code section 1825. Answering this question presents a threshold matter of statutory interpretation. "[O]ur fundamental task is `to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' [Citations.] We begin by examining the statutory language because it generally is the most reliable indicator of legislative intent. [Citation.] We give the language its usual and ordinary meaning, and `[i]f there is no ambiguity,' then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citation.] If, however, the statutory language is ambiguous, 'we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history.'... Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute." (Allen v. Sully-Miller Contracting Co. (2002) 28 Cal.4th 222, 227, 120 Cal.Rptr.2d 795, 47 P.3d 639.) We must also attempt to give effect to every word in a statute and avoid constructions that render statutory terms surplusage or meaningless. (See People v. Craft (1986) 41 Cal.3d 554, 560, 224 Cal. Rptr. 626, 715 P.2d 585.)
We are persuaded, in view of the language used in the LPS statute and Probate Code, as well as the differences between LPS and Probate Code conservatorships (see People v. Karriker (2007) 149 Cal.App.4th 763, 779, 57 Cal.Rptr.3d 412), that the "court investigator" identified in Probate Code section 1825 refers to the investigator appointed by the court for purposes of Probate Code conservatorships, not the county's appointed investigator in LPS proceedings. Our first indicium of legislative intent is the Legislature's use of differing terminology in the LPS scheme. As is evident from our summary above, the Legislature does not use the term "court investigator" in the LPS Act; *402 the investigator is referred to as the "officer providing conservatorship investigation," (Welf. & Inst.Code, §§ 5354, 5356, 5358, subd. (c)(1)), the "conservatorship investigator" (Welf. & Inst.Code, §§ 5352.5, 5355, 5350, subd. (b)(1)), or the "conservatorship investigation officer." (Welf. & Inst.Code, § 5352.) Where the Legislature has used different language in one part of a statute than it does in other sections concerning a related subject, it must be presumed the Legislature intended a different meaning. (People v. Carter (1998) 60 Cal.App.4th 752, 755, 70 Cal. Rptr.2d 569, citing Committee of Seven Thousand v. Superior Court (1988) 45 Cal.3d 491, 507, 247 Cal.Rptr. 362, 754 P.2d 708; see also City of Port Hueneme v. City of Oxnard (1959) 52 Cal.2d 385, 395, 341 P.2d 318 [" Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed'"].)
The Legislature's use of distinct terminology reflects the differing procedures involved in LPS and Probate Code conservatorship investigations. (Welf. & Inst. Code, § 5350, subd. (f); see Conservatorship of Ivey (1986) 186 Cal.App.3d 1559, 1564, 231 Cal.Rptr. 376 [conservatorship investigation shall be conducted according to the LPS Act and not the Probate Code].) The investigator under each scheme is appointed by a different body. As we have explained, under the LPS Act, the conservatorship investigator is "appointed or designated by the governing body of cases in which conservatorship is recommended" under the LPS Act, and in San Diego, it is the public conservator. (Welf. & Inst.Code, § 5008, subd. (g); see part II, ante.) The LPS Act contains its own provisions relating to the LPS investigator's responsibilities and written report, which the investigator is required to provide to the proposed conservatee. (Welf. & Inst.Code, § 5354.)
In Probate Code conservatorships, as the term within Probate Code section 1825 suggests, the court appoints the court investigator "when one is required for the purposes of a proceeding under this division." (Prob.Code, § 1454, italics added.)[8] Such an appointment is necessary only when the petition has alleged that the proposed conservatee is unwilling to attend the hearing or the proposed conservatee is medically unable to do so. (Conservatorship of Sides (1989) 211 Cal.App.3d 1086, 1094, 260 Cal.Rptr. 16.) The court investigator's duties are spelled out in Probate Code section 1826, requiring, among other things, that the court investigator interview the proposed conservatee personally; inform him or her of the contents of the citation, nature of the proceeding, and his or her hearing rights; determine whether the proposed conservatee is able to attend the hearing; review the petition's allegations; and determine whether the proposed conservatee wishes to contest the conservatorship's establishment, objects to the proposed conservator, or wishes to be represented by legal counsel. (Prob.Code, § 1826.) The court investigator in particular is required to report these matters to the court before the hearing, including the issues of representation of legal counsel and "whether the proposed conservatee is *403 not willing to attend the hearing, does not wish to contest the establishment of the conservatorship, and does not object to the proposed conservator or prefer that another person act as conservator." (Prob. Code, § 1826, subd. (k); see also Conservatorship of Sides, at p. 1094, 260 Cal. Rptr. 16.)
As Agency points out, because the Legislature has expressly excluded the requirements of Probate Code section 1826 from the LPS Act (Welf. & Inst.Code, § 5350), there is no provision in the LPS scheme for the "court investigator" to report in writing the proposed conservatee's willingness to attend the hearing or desire to contest the conservatorship. In our view, the exclusion of such duties from the LPS Act is legislative acknowledgment that the court investigator is not a participant in the LPS scheme. And in the LPS Act, the conservatorship investigator's duties (Welf. & Inst.Code, § 5354) do not include advising the court about the proposed conservatee's willingness to be present or acquiescence to the conservatorship. If the Legislature had intended that the LPS conservatorship investigation officer be the sole person with authority to communicate a proposed conservatee's waiver, it could have specified that role in the LPS Act as it did for the court investigator in the Probate Code. These differences are important indicators that the Legislature could not have intended to equate the "conservatorship investigation officer" referred to in the LPS scheme (Welf. & Inst.Code, §§ 5352, 5354) with the "court investigator" referenced in Probate Code section 1825, and thus did not give the LPS conservatorship investigator the sole power to communicate to the court the conservatee's unwillingness to attend the LPS hearing.
We turn to the question of whether appointed counsel has the authority to communicate the proposed conservatee's waiver of his or her right to be present at the LPS hearing.[9] Addressing the statutory right set forth in Probate Code section 1825, we conclude counsel may do so. LPS proceedings are civil in nature; the conservatee is not a criminal defendant and the LPS Act's aims and objectives are not similar to that of the criminal law. (Ben C, supra, 40 Cal.4th at pp. 537, 538, 53 Cal.Rptr.3d 856, 150 P.3d 738; Conservatorship of Susan T. (1994) 8 Cal.4th 1005, 1015, 36 Cal.Rptr.2d 40, 884 P.2d 988 (Susan T.).) Because John's right to his presence at the LPS hearing as provided in Probate Code section 1825 is a matter of legislative grant, it may be waived by counsel with the express consent of the proposed conservatee. (E.g., People v. Rowell (2005) 133 Cal.App.4th 447, 451, 452, 34 Cal.Rptr.3d 843; Conservatorship of Mary K. (1991) 234 Cal.App.3d 265, 271, 285 Cal.Rptr. 618 [proposed conservatee's right to a jury trial on an LPS conservatorship petition, which exists only as provided by statute, was validly waived by counsel who communicated her client's wishes and does not require an on-the-record personal waiver]; Conservatorship of Maldonado (1985) 173 Cal.App.3d 144, 148, 218 Cal.Rptr. 796 [same]; Christopher A, supra, 139 Cal.App.4th at pp. 612-613, *404 43 Cal.Rptr.3d 427 [counsel may not without client's consent enter into an agreement that impairs the client's substantial rights], citing Linsk v. Linsk (1969) 70 Cal.2d 272, 278, 74 Cal.Rptr. 544, 449 P.2d 760 [right to be present and participate at trial is a substantial right that cannot be waived by counsel without client's authorization].)
In People v. Rowell, the Court of Appeal addressed the defendant's contention that the court erred by accepting his defense counsel's representation, in a written declaration filed under penalty of perjury, that the defendant no longer wanted a jury trial in his sexually violent predator (SVP) commitment proceeding (Welf. & Inst. Code, § 6600 et seq.). (Rowell, supra, 133 Cal.App.4th 447, 450, 452, 34 Cal.Rptr.3d 843.) Pointing out that an SVP proceeding is civil in nature and thus the state and federal constitutional protection of the right to jury trial afforded to criminal defendants was inapplicable, the court held the right was validly waived by counsel; that defendant's personal waiver was not required. "In Allen v. Illinois [ (1986) ] 478 U.S. 364[, 106 S.Ct. 2988, 92 L.Ed.2d 296] ..., the United States Supreme Court expressly rejected the notion that civil commitment proceedings `requir[e] the full panoply of rights applicable' in criminal cases. [Citation.] And both the United States and California Supreme Courts have made clear that all of the protections of a criminal case do not apply to civil commitment proceedings for sexual offenders as long as the purpose and effect of the proceeding is not punitive. [Citations.] [¶] Hence, the fact that the interests involved in involuntary commitment proceedings are fundamental enough to require a jury trial does not lead ineluctably to the conclusion that the waiver of a jury trial in such proceedings must be personal as in criminal prosecutions. The fundamental right to a jury has been protected by [Welfare and Institutions Code] section 6603, which grants the defendant the right to a jury trial upon demand. But the SVP commitment proceeding is a civil proceeding, not a criminal one, and the full panoply of rights applicable in criminal cases do not apply." (Rowell, at pp. 453-454,* 34 Cal.Rptr.3d 843.)
These principles were applied to LPS proceedings by Ben C, supra, 40 Cal.4th 529, 53 Cal.Rptr.3d 856, 150 P.3d 738, which considered whether state or federal due process guarantees compelled an extension of Anders/Wende[10] procedures to LPS conservatorship proceedings. (Ben C, 40 Cal.4th at pp. 535-536, 539, 53 Cal. Rptr.3d 856, 150 P.3d 738.) The court in Ben C. reiterated that not all criminal due process safeguards are appropriately applied to the LPS Act. (Ben C, supra, 40 Cal.4th at p. 538, 53 Cal.Rptr.3d 856, 150 P.3d 738.) It pointed out that in Susan T., supra, 8 Cal.4th 1005, 36 Cal.Rptr.2d 40, 884 P.2d 988, it held the exclusionary rule does not apply, analogizing LPS conservatorships to commitment proceedings for the mentally retarded: "'"The commitment is not initiated in response, or necessarily related, to any criminal acts; it is of limited duration, expiring at the end of one year and any new petition is subject to the same procedures as an original commitment [citation]; the petitioner need not be a public prosecutor.... The sole state interest, legislatively expressed, is the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community. The commitment may not reasonably be deemed punishment either in its design or purpose. It is not analogous to criminal proceedings."'" *405 (Ben C., at p. 538,53 Cal.Rptr.3d 856, 150 P.3d 738, quoting Susan T., at p. 1015, 36 Cal.Rptr.2d 40, 884 P.2d 988.)
We acknowledge that despite its civil nature, the private interests involved in a conservatorship proceeding are the potential loss of liberty and stigma resulting from the disabilities imposed on a conservatee, including commitments lasting up to one year with the potential for additional year-long extensions. (Christopher A, supra, 139 Cal.App.4th at p. 611, 43 Cal.Rptr.3d 427, quoting Conservatorship of Roulet (1979) 23 Cal.3d 219, 223, 152 Cal.Rptr. 425, 590 P.2d 1 (Roulet)) ["'civil commitment to a mental hospital, despite its civil label, threatens a person's liberty and dignity on as massive a scale as that traditionally associated with criminal prosecutions'"]; Ben C, supra, 40 Cal.4th at p. 540, 53 Cal.Rptr.3d 856, 150 P.3d 738.) "These significant liberty interests invoke strict application of the protective umbrella of the statutory procedures to all proposed conservatees under the gravely disabled provisions of the LPS Act." (Conservatorship of Ivey, supra, 186 Cal.App.3d at p. 1566, 231 Cal. Rptr. 376; see also Ben C., at pp. 540-541, 53 Cal.Rptr.3d 856, 150 P.3d 738.) Nevertheless, as in Rowell, these concerns do not compel the conclusion that a proposed conservatee must personally waive his or her statutory right to be present at the LPS hearing. Accordingly, we agree with Agency that in a hearing to establish an LPS conservatorship, the proposed conservatee's appointed attorney has the power and authority to communicate the proposed conservatee's waiver of his or her presence to the court.

IV. Due Process Right to Presence at Hearing To Establish LPS Conservatorship

Our analysis of John's statutory right under Probate Code section 1825 does not answer the question of whether a proposed conservatee under the LPS Act nevertheless has a fundamental due process right, independent of statute, to be present at the hearing to establish a conservatorship. Relying upon Conservatorship of Pamela J. (2005) 133 Cal.App.4th 807, 35 Cal.Rptr.3d 228 (Pamela J.), John contends that "[t]he fact the proposed conservatee requests to be absent is not determinative, when his or her presence is otherwise required by statute and due process considerations." John appears to argue that constitutional due process guarantees require that irrespective of his wishes, his presence at the LPS conservatorship establishment hearing is mandatory and is not subject to waiver.
In Pamela J., this court interpreted a specific provision of the LPS Act, Welfare and Institutions Code section 5326.7, relating to the evidentiary hearing to determine the capacity of a patient to give or refuse to give consent to electroconvulsive treatment (ECT). (Pamela J., supra, 133 Cal. App.4th at pp. 813-814, 35 Cal.Rptr.3d 228.) In particular, the question was whether the patient's presence was required when subdivision (f) of Welfare and Institutions Code section 5326.7 specifically stated that the "patient shall be present and represented by legal counsel" at the hearing to determine the patient's capacity to give written informed consent. (Pamela J., at p. 823, 35 Cal.Rptr.3d 228.) Examining all of the pertinent LPS Act provisions pertaining to ECT, we held the trial court prejudicially erred by making the ultimate determination as to Pamela J.'s capacity without her presence. (Id. at pp. 823-826, 35 Cal.Rptr.3d 228.) In particular, we observed our conclusion as to the patient's mandatory presence was supported by the omission of any provision in the statutes pertaining to ECT for waiving *406 the patient's presence: "The Legislature knows how to include specific provisions for the waiver of a person's presence, and has done so in other LPS proceedings, i.e., for the establishment and reestablishment of LPS conservatorships.... The fact the Legislature did not likewise include a provision for waiver of the patient's presence for the evidentiary hearing on capacity in subdivision (f) of [Welfare and Institutions Code] section 5326.7 provides further evidence of its intent to make the patient's presence mandatory." (Pamela J., 133 Cal.App.4th at pp. 823-824, 35 Cal.Rptr.3d 228.)
We are not persuaded that Pamela J. compels the conclusion John seeks. The underlying inquiry in that case was whether the patient was competent to give informed consent to treatment, an inquiry uniquely assisted by observing the patient in person, and our decision turned on application and interpretation of the specific statutory provisions involved in the ECT hearings. Unlike Probate Code section 1825, those statutes did not-include a provision for a proposed conservatee's waiver of his or her presence. Further, in Pamela J., counsel objected to proceeding in his client's absence (Pamela J., supra, 133 Cal.App.4th at p. 819, 35 Cal.Rptr.3d 228) and the court assumed a waiver, whereas here, John communicated his waiver to his counsel, who voiced it to the court. Given Pamela J.'s unique facts, it does not support John's position that due process requires the proposed conservatee's presence at the LPS conservatorship establishment hearing irrespective of the proposed conservatee's request to be absent.
Nevertheless, we have already held that the private interests involved in LPS conservatorship proceedings are substantial, in light of the threat to a person's personal liberty and dignity. (Christopher A, supra, 139 Cal.App.4th at pp. 611, 613, 43 Cal.Rptr.3d 427.) Given the substantial curtailment of liberty resulting from a conservatorship under the LPS Act (Roulet, supra, 23 Cal.3d at p. 227, 152 Cal.Rptr. 425, 590 P.2d 1; Christopher A, supra, 139 Cal.App.4th at pp. 611, 613, 43 Cal. Rptr.3d 427; Conservatorship of Ivey, supra, 186 Cal.App.3d at p. 1565, 231 Cal. Rptr. 376), we have no difficulty concluding that a defendant facing such a loss of freedom has a fundamental due process right to be present at the establishment hearing. (See Vitek v. Jones (1980) 445 U.S. 480, 491, 100 S.Ct. 1254, 63 L.Ed.2d 552; O'Connor v. Donaldson (1975) 422 U.S. 563, 580, 95 S.Ct. 2486, 45 L.Ed.2d 396 ["There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is deprivation of liberty which the State cannot accomplish without due process of law"].) Vitek reasons, "[t]he loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital 'can engender adverse social consequences to the individual' and that `[w]hether we label this phenomena "stigma" or choose to call it something else ... we recognize that it can occur and that it can have a very significant impact on the individual.'" (Vitek v. Jones, supra, 445 U.S. at p. 492, 100 S.Ct. 1254, quoting Addington v. Texas (1979) 441 U.S. 418, 425-426, 99 S.Ct. 1804, 60 L.Ed.2d 323; see In re Watson (1979) 91 Cal.App.3d 455, 459-462, 154 Cal. Rptr. 151 [on habeas petition of appellant committed under statute governing commitment of mentally retarded persons (Welf. & Inst.Code, § 6500 et seq.), court held "denial of petitioner's right to be present during the presentation of evidence against her which could and did result in a substantial loss of personal liberty, absent an on-the-record showing that she waived that right or was incapable of doing so by reason of either physical or *407 mental incapacity, deprived her of her fundamental constitutional right to due process of law"].)
Having determined that due process generally confers on a proposed conservatee the right to attend his or her conservatorship establishment hearing, the question remains what procedural protections are due. {People v. Otto (2001) 26 Cal.4th 200, 210, 109 Cal.Rptr.2d 327, 26 P.3d 1061, quoting Morrissey v. Brewer (1972) 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484.) We decline to hold that due process requires the court to force John's presence so as to question John personally regarding his desire not to attend or otherwise assure itself by personal observation that he is competent to waive his right. To decide whether federal and state procedural due process guarantees the specific protection John seeks, not only do we look to John's private liberty interests, but also' to the risk of erroneous deprivation under the current procedures and probable value of additional safeguards; the dignitary interest in informing individuals of the nature, grounds and consequences of the action;, and the government interests involved, including fiscal or administrative burdens resulting from the additional procedures.[11] (Conservatorship of Tian L. (2007) 149 Cal.App.4th 1022, 1028, 57 Gal.Rptr.3d 382; see also Conservatorship of Moore (1986) 185 Cal.App.3d 718, 728-729, 229 Cal.Rptr. 875.) In our view, the cost or detriment of implementing John's proposed safeguard of unwaivable mandatory presence is highboth to Agency in terms of transportation, and to a mentally fragile person in terms of their health or dignity by forcing their appearance only to ascertain if he or she wished to appearand would outweigh the additional protection provided by this procedure particularly given the presence of counsel, who we presume to be competent. (Conservatorship of Isaac O. (1987) 190 Cal.App.3d 50, 54, 235 Cal.Rptr. 133; Conservatorship of Ivey, supra, 186 Cal. App.3d at p. 1566, 231 Cal.Rptr. 376.)
Rather, we conclude the proposed conservatee's due process right is subject to waiver that may be communicated by counsel on the conservatee's behalf. (E.g., Conservatorship of Moore, supra, 185 Cal. App.3d at p. 733, 229 Cal.Rptr. 875.) In Moore, we drew a "fair inference" in the reestablishment context, that a conservatee had knowingly and intelligently waived his right to a reestablishment hearing given the presence of counsel who communicated the waiver to the court by sworn affidavit. (Moore, supra, 185 Cal.App.3d at p. 733, 229 Cal.Rptr. 875.) We stated, "`When counsel is present, a voluntary and intelligent waiver of known rights may properly be inferred from the record, without a specific on-the-record showing as to *408 each right....'" (Ibid., quoting Conservatorship of Chambers (1977) 71 Cal.App.3d 277, 287,139 Cal.Rptr. 357.)
We reject John's contention that his counsel's unsworn representation was insufficient to demonstrate that his waiver was knowing and intelligent. This court dealt with a similar claim in Conservatorship of Tian L., supra, 149 Cal.App.4th 1022, 57 Cal.Rptr.3d 382 in the context of a petition to reestablish a conservatorship under the LPS Act. There, the appellant, Tian, contended the court violated her procedural due process rights by accepting her counsel's sworn affidavit that she had no objection to the reestablishment of the conservatorship on an ex parte basis. (Id. at pp. 1027, 1032, 57 Cal.Rptr.3d 382.) Tian's specific challenge was not to the court's authority to reestablish her conservatorship on an ex parte basis (which we upheld in Conservatorship of Moore, supra, 185 Cal.App.3d 718, 229 Cal.Rptr. 875), but to the content of the stipulation form: she argued that to satisfy due process requirements, the stipulation form for the reestablishment of a conservatorship had to recite the proposed placement and disabilities, indicate counsel discussed these matters with the conservatee along with the conservatee's right to a jury trial, and require the conservatee's signature in addition to counsel's signature. (Tian L., at pp. 1027, 1031, 57 Cal.Rptr.3d 382.)
Though we agreed counsel's form affidavit could be improved to be more specific (Tian L., supra, 149 Cal.App.4th at p. 1031, 57 Cal.Rptr.3d 382), we held Tian's procedural due process rights were honored. We observed that the LPS Act's reestablishment procedures contain numerous safeguards against the risk of erroneous intrusion and that Tian conceded she had received all the required statutory notices. (Tian L., at pp. 1028-1031, 57 Cal.Rptr.3d 382.) Further, we noted her counsel met in person and "discussed reestablishment" with her and that central to reestablishment was the issues of placement and disabilities. (Id. at p. 1031, 57 Cal.Rptr.3d 382.)
Our conclusion in Tian L. that the conservatee's due process rights were adequately protected did not turn on the existence of a sworn affidavit by counsel or its contents. Rather, our focus was on the numerous safeguards present in conservatorship reestablishment procedures. (Tian L., supra, 149 Cal.App.4th at pp. 1028-1031, 57 Cal.Rptr.3d 382.) Such protections, including notice served on the proposed conservatee, advisement of the right to a hearing, representation by counsel and right to demand a jury trial, and service of copies of the conservatorship petition and investigation report on the proposed conservatee, are similarly present when an initial conservatorship is sought. (Edward W. v. Lamkins (2002) 99 Cal.App.4th 516, 526-527, 122 Cal.Rptr.2d 1 [summarizing procedures]; In re Gandolfo (1984) 36 Cal.3d 889, 897, fn. 3, 206 Cal.Rptr. 149, 686 P.2d 669 [same]; Welf. & Ins.Code, §§ 5350, 5352, 5354; Prob. Code, §§ 1823-1824.) These procedures provide constitutionally sound safeguards against error, and "welcomed and encouraged [John's] participation in the conservatorship decision. His worth and dignity were not overlooked and indeed, the local rules ensured, through appointed counsel, direct communications with the court." (Tian L., at p. 1030, 57 Cal.Rptr.3d 382, quoting Conservatorship of Moore, supra, 185 Cal.App.3d at p. 730, 229 Cal.Rptr. 875.)
In Christopher A., supra, 139 Cal. App.4th 604, 43 Cal.Rptr.3d 427, we explained counsel's role in the LPS conservatorship context: "The role of an attorney in litigation is to `[protect] the client's rights and [achieve] the clients fundamental goals.' [Citation.] In carrying out this duty, the attorney has the general authority *409 to stipulate to procedural matters that may `"be necessary or expedient for the advancement of [the] client's interest[s]."' [Citation.] However, the attorney may not, without the consent of his or her client, enter into an agreement that 'impair[s] the client's substantial rights or the cause of action itself.'" {Christopher A., at pp. 612-613, 43 Cal.Rptr.3d 427, italics added, see also Blanton v. Womancare, Inc. (1985) 38 Cal.3d 396, 404-405, 212 Cal.Rptr. 151, 696 P.2d 645 [counsel is not authorized merely by virtue of retention to impair the client's substantial rights absent client's consent].) Unlike the circumstances in Christopher A, where the record did not show the conservatee had consented to the terms of the proposed judgment regarding placement, disabilities and conservator powers (Id. at p. 613, 43 Cal.Rptr.3d 427), here, counsel represented to the court that John had consented to his conservatorship and elected to waive his presence at the hearing. Having obtained John's consent, counsel properly communicated his wishes to the court without contravening the principles expressed in Christopher A. and Blanton, supra, 38 Cal.3d 396, 212 Cal. Rptr. 151, 696 P.2d 645.

V. On-Record Voir Dire

We need not reach John's contention that the court erred by failing to advise him pursuant to Probate Code section 1828, which requires that the court, prior to establishment of a conservatorship, advise the proposed conservatee of the nature and consequences of the proceeding.[12] Probate Code section 1828 expressly eliminates the requirement upon a valid waiver of the proposed conservatee's presence: "This section does not apply where both of the following conditions are satisfied: [¶] (1) The proposed conservatee is absent from the hearing and is not required to attend the hearing under the provisions of subdivision (a) of section 1825. [¶] (2) Any showing required by Section 1825 has been made." (Prob.Code, § 1828, subd. (c).) Having validly waived his right to be present at his conservatorship establishment hearing via his appointed counsel, the court was not required to engage in the Probate Code section 1828 advisements.

DISPOSITION
The judgment is affirmed.
WE CONCUR: AARON and IRION, JJ.
NOTES
[1] We abbreviate John L.'s name to protect his privacy. (Welf. & Inst.Code, § 5325.1, subd. (b); Conservatorship of Christopher A. (2006) 139 Cal.App.4th 604, 608, 43 Cal.Rptr.3d 427, fn. 1 (Christopher A.).)
[2] In full, Dr. Gorman's declaration provided: "I declare that I have informed the above-named patient of the following matters: [10 1. That a `Recommendation for Conservatorship of the Person' is being filed with the Superior Court alleging that the patient is gravely disabled. [¶] 2. The proposed temporary conservator is the Public Conservator. [¶] 3. The appointment of a conservator is a legal adjudication of the patient's inability to, as a result of a mental disorder, provide for his or her basic necessities for food, clothing or shelter. [¶] 4. At the hearing on the petition, the Court may order that the conservator make all medical decisions on behalf of the patient and deprive the patient of his or her right to contract, vote and/or have a license to operate a motor vehicle, or shall/shall not have the right to possess firearms. [¶] 5. A hearing will be held within 30 days of filing a petition for conservatorship, and the Patient will have the right to attend the hearing and confront and cross-examine witnesses who may testify, and he/she may produce witnesses to testify in opposition to the petition. [¶] 6. The Patient has the right to hire an attorney of his or her choice to represent him or her and, if unable to do so because of lack [of] funds, the Court will appoint an attorney to represent him/her. The Patient may be required to pay for the court-appointed attorney if he/she is found to be financially able to do so. [¶] 7. The patient may demand a court or jury trial on the issue of grave disability. [¶] 8. A copy of this declaration has been given to the patient. [¶] I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and this declaration was executed on 02/24/2006."
[3] The investigator recounted: "He has been described as extremely manic, grandiose, non-directable, intrusive, manipulative, having poor boundaries, stealing food from other patients, walking around naked, not sleeping, spending hours on the phone and not following unit rules, influencing other patients not to take medication, portraying himself as a mentor and healer to other patients, refusing medication himself until a Riese [v. St. Mary's Hospital & Medical Center (1987) 209 Cal. App.3d 1303, 271 Cal.Rptr. 199] [competency order] was upheld ... [and] remained too unstable and uncooperative to be referred to a board and care at the end of his hospitalization...." (Italics added.) Riese recognized an LPS patient's right to refuse antipsychotic medication, which, as now codified in the LPS Act, can be overridden upon a determination of that person's incapacity to refuse treatment. (Welf. & Inst.Code, § 5332, subd. (b); In re Qawi (2004) 32 Cal.4th 1, 18, 7 Cal.Rptr.3d 780, 81 P.3d 224.)
[4] Probate Code section 1825, subdivision (a) provides: "The proposed conservatee shall be produced at the hearing except in the following cases: [¶] (1) Where the proposed conservatee is out of the state when served and is not the petitioner. [¶] (2) Where the proposed conservatee is unable to attend the hearing by reason of medical inability. [¶] (3) Where the court investigator has reported to the court that the proposed conservatee has expressly communicated that the proposed conservatee (i) is not willing to attend the hearing, (ii) does not wish to contest the establishment of the conservatorship, and (iii) does not object to the proposed conservator or prefer that another person act as conservator, and the court makes an order that the proposed conservatee need not attend the hearing."
[5] Welfare and Institutions Code section 5350 contains the following additional exceptions from the procedures of Probate Code section 1400 et seq.: a gravely disabled minor may have a conservator (Welf. & Inst.Code, § 5350, subd. (a)); generally, the priorities for appointment of the conservator shall follow the list in Probate Code, section 1812 (Welf. & Inst.Code, § 5350, subd. (b)); proceedings for conservatorships under the LPS Act are required to be superior and concurrent to existing probate conservatorships and petitions and notice of LPS proceedings must be given to any Probate Code guardian or conservator (Welf. & Inst.Code, § 5350, subds. (c), (g)); jury trial on the issue of grave disability is required (Welf. & Inst.Code, § 5350, subd. (d)); there are rules for imposition of a conservatorship in the event of available third-party assistance (Welf. & Inst.Code, § 5350, subd. (e)); and "[a]s otherwise provided in this chapter." (Welf. & Inst.Code, § 5350, subd. (h).)
[6] Welfare and Institutions Code section 5355 provides in part: "If the conservatorship investigation results in a recommendation for conservatorship, the recommendation shall designate the most suitable person, corporation, state or local agency or county officer, or employee designated by the county to serve as conservator. No person, corporation, or agency be designated as conservator whose interests, activities, obligations or responsibilities are such as to compromise his or their ability to represent and safeguard the interests of the conservatee. Nothing in this section shall be construed to prevent the State Department of Mental Health from serving as guardian pursuant to [Welfare and Institutions Code s]ection 7284, or the function of the conservatorship investigator and conservator being exercised by the same public officer or employee."
[7] A conservatorship proceeding may also be initiated for a defendant committed to a state hospital under Penal Code section 1370 on recommendation of the hospital's medical director "to the conservatorship investigator of the county of residence of the person prior to his or her admission to the hospital." (Welf. & Inst.Code, § 5352.5.) Under Penal Code section 1370, where a defendant is returned to the court and it appears to the court he or she is gravely disabled, "the court shall order the conservatorship investigator of the county of commitment of the defendant to initiate conservatorship proceedings for the defendant...." (Pen.Code, § 1370.)
[8] Probate Code section 1454 provides: "The court shall appoint a court investigator when one is required for the purposes of a proceeding under this division. The person appointed as the court investigator shall be an officer or special appointee of the court with no personal or other beneficial interest in the proceeding." (Prob.Code, § 1454, italics added; see also Prob.Code, § 1419 ["`Court investigator' means the person referred to in Section 1454"].)
[9] We are not presented with the question of whether counsel may waive that right without the client's consent or over the client's objection. (See People v. Masterson (1994) 8 Cal.4th 965, 971-974, 35 Cal.Rptr.2d 679, 884 P.2d 136 [counsel may waive defendant's statutory right to a jury trial in mental competency proceeding even over objection of client].) Since its inception, the LPS Act has required the provision of an attorney for the proposed conservatee. (Welf. & Inst.Code, §§ 5350, 5365; see Conservatorship of Ben C, (2007) 40 Cal.4th 529, 541, 53 Cal.Rptr.3d 856, 150 P.3d 738 (Ben C); Conservatorship of Ivey, supra, 186 Cal.App.3d 1559, 1564, 231 Cal.Rptr. 376.)
[10] Anders v. California (1967) 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493. People v. Wende (1979) 25 Cal.3d 436, 158 Cal.Rptr. 839, 600 P.2d 1071.
[11] "'Under the Fourteenth Amendment of the U.S. Constitution, the propriety of the actions of government are determined based on the consideration of: (1) the private interests involved, (2) the risk of erroneous deprivation under the current procedures, (3) the probable value of additional safeguards, and (4) the government interests involved. [Citations.] The California Constitution focuses broadly on the "individual's due process liberty interest to be free from arbitrary adjudicative procedures." [Citation.] This requires "`consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible government official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'"'" (Tian L., supra, 149 Cal.App.4th at p. 1028, 57 Cal.Rptr.3d 382, quoting Christopher A., supra, 139 Cal.App.4th at pp. 610-611, 43 Cal.Rptr.3d 427.)
[12] Probate Code section 1828 provides in part: "(a) ... [P]rior to the establishment of a conservatorship of the person or estate, or both, the court shall inform the proposed conservatee of all of the following: [¶] (1) The nature and purpose of the proceeding. [¶] (2) The establishment of a conservatorship is a legal adjudication of the conservatee's inability properly to provide for the conservatee's personal needs or to manage the conservatee's own financial resources, or both, depending on the allegations made and the determinations requested in the petition, and the effect of such an adjudication on the conservatee's basic rights, [¶] (3) The proposed conservatee may be disqualified from voting if not capable of completing an affidavit of voter registration. [¶] (4) The identity of the proposed conservator. [¶] (5) The nature and effect on the conservatee's basic rights of any order requested under Chapter 4 (commencing with Section 1870), and in the case of an allegedly developmentally disabled adult, the specific effects of each limitation requested in such order. [¶] (6) The proposed conservatee has the right to oppose the proceeding, to have the matter of the establishment of the conservatorship tried by jury, to be represented by legal counsel if the proposed conservatee so chooses, and to have legal counsel appointed by the court if unable to retain legal counsel."